Richard J. MARRA, Petitioner

v.

David LARKINS, Superintendent Dallas SC., and District Attorney for Philadelphia County, and The Attorney General of the State of Pennsylvania, Respondents

Civil Action No. 96–2375.

United States District Court, E.D. Pennsylvania.

Aug. 15, 2000.

576

Peter Goldberger, Law Office of Peter Goldberger, Ardmore, PA, for petitioner.

Donna G. Zucker, Philadelphia, PA, Thomas Dolgenos, Assistant District Attorney, District Attorney's Office, Philadelphia, PA, for respondents.

## ORDER

POLLAK, District Judge.

Upon consideration of the pleadings and record herein, and after review of the Report and Recommendation of United States Magistrate Judge Charles B. Smith, together with petitioner's objections and respondents' responses thereto, it is hereby ORDERED that:

1. The Report and Recommendation is APPROVED and ADOPTED.

2. The Petition for Reconsideration of the dismissal of the Petition of Habeas Corpus, pursuant to 28 U.S.C. § 2254, is DENIED.

3. It is hereby CERTIFIED that there is probable cause for appeal of the denial of the Petition for Habeas Corpus.

## OPINION

Richard Marra, who is serving a life sentence in a Pennsylvania prison for the first degree murder of Michael Ragno,[1] has challenged his murder conviction by petitioning for habeas corpus pursuant to 28 U.S.C. § 2254.

In his petition for habeas corpus, Mr. Marra presented three claims. The first claim was that the evidence was insufficient to support the murder conviction. The second claim was that the trial judge, in responding to the jury's request that grand jury testimony of a key prosecution witness, Karen Antonelli, be reread, had taken so narrowly literal a view of the jury's request that the testimony read back to the jury was likely to have conveyed a radically and crucially skewed sense of what the witness had seen. The third claim was that trial counsel Robert Simone had been markedly ineffective. This claim had two parts. The first was that counsel should have presented character witnesses. The second was that Mr. Simone was laboring under a conflict of interest—namely, a close link to Phillip Narducci—that led him to refrain from presenting evidence (statements and a videotape) inculpatory of Mr. Narducci and of a co-defendant of Mr. Marra's.

Magistrate Judge Smith filed a Report and Recommendation recommending denial of the petition for habeas corpus. Judge Smith found the evidence against Mr. Marra to be sufficient to support the verdict. He concluded that the trial judge had not abused his discretion in determining what portion of Ms. Antonelli's testimony should be reread to the jury. And he determined that trial counsel's decisions not to present certain types of evidence in Mr. Marra's defense were strategic choices that were not unreasonable. Judge Smith also found that Mr. Marra's claim that Mr. Simone had a disabling conflict of interest had not been sufficiently pursued in the state courts and hence was procedurally barred in this habeas proceeding.

I accepted Judge Smith's Report and Recommendation, modifying it somewhat to reflect my differing understanding of the evidence presented by the Commonwealth at trial. The record as I read it added up to a weaker prosecution case; but I concluded, nonetheless, that the evidence against Mr. Marra was sufficient to support a conviction. On the other issues I found no reason to question Judge Smith's assessment.

Mr. Marra, proceeding *pro se*, moved for reconsideration. I denied the motion. Meanwhile, Mr. Marra had retained new counsel who, three days after denial of the motion for reconsideration, moved that the order denying reconsideration be vacated with a view to permitting the filing of more substantial submissions. I granted that motion. Additional submissions were filed. I referred the case back to Judge Smith for preparation of a new Report and Recommendation addressed to new counsel's arguments in favor of the motion for reconsideration.

Judge Smith has prepared a new Report and Recommendation recommending denial of the motion for reconsideration.

---

1. Mr. Marra was also found guilty of possessing an instrument of crime—the gun with which he was alleged to have shot Mr. Rag-

no—and was sentenced to two-and-a-half years sequential to the life sentence.

I conclude that Judge Smith's recommendation should be sustained:

(1) The most difficult question is whether there was sufficient evidence to support the verdict. Judge Smith's careful analysis is, in my view, persuasive that the evidence was sufficient—even if only by a narrow margin:

> In the court's request for Reconsideration, it was observed that Karen Antonelli's testimony was less inculpatory than I earlier found because the record "does not support a finding that Ms. Antonelli saw the petitioner standing by the body of the victim. In fact she explicitly stated at trial that she did not see the body at all."[8] He added that "taken alone, Ms. Antonelli's testimony is of limited value in supporting the inference that petitioner was one of the three men seen by Ms. Murray." Memorandum at 2.

Upon review of Ms. Antonelli's testimony, I agree that, taken alone, her testimony does not establish plaintiff as the shooter and is not itself inculpatory. The same can be said for the testimony of Williams Rodgers, Susan Murray, Tina Marie Bianchi, and Bernard Mulholland. Taken individually, none of this testimony would be sufficient to convict petitioner since Murray, Bianchi, and Mulholland could not identify petitioner as the murderer and Antonelli testified that she did not see the body near the defendants. However, each of these witnesses' testimony is probative and their cumulative effect "based on an interpretation of the facts and *inferences* (emphasis added) made most favorably to the prosecution," could rationally lead a jury to conclude that the petitioner was guilty of first degree murder.[9] *Jackson v. Virginia*, [443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)].

In assessing the totality of the testimony before them, the jury heard: 1) Rodgers testify about the confrontation between the victim and the petitioner and his threat to Ragno that "You'll see who I am"; 2) Susan Murray testify that she saw a man in the middle of three fire a gun and shoot the victim; 3) Karen Antonelli testify that she turned and looked at the area where the loud noise came from and identified petitioner as the one in the middle, and her possibly conflicting grand jury testimony, that they wanted reread to them during deliberations, which put into question whether she saw the defendants near the body; 4) Tina Marie Bianchi testify that she saw someone run down the steps immediately after the "loud noise" and apparently conceal a dark object in his pants; and 5) Bernard Mulholland corroborate Rodgers' and Bianchi's testimony concerning the threats made to Ragno at the earlier confrontation and petitioner['s] actions after the shot being the first to run out of the club with his hand in his pocket apparently concealing something and flee in a car later found burned and registered to the petitioner's family.

From this testimony and the inferences permitted to be drawn from such under *Jackson*, I find that a rational trier of fact could have found the essential elements of the crime of first degree murder beyond a reasonable doubt. *Sullivan v. Cuyler*, [723 F.2d 1077 (3d Cir.1983)]; *Jackson v. Virginia.*

8 Relying on the trial testimony as related in the state court decisions, I erroneously wrote in my prior Report that Susan Murray saw the three men in a "semi-circle" and that Karen Antonelli observed the men standing over the body. Report and Recommendation at 10.

9 Under 18 Pa.C.S.A. § 2502, first degree murder is defined as follows:

A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing.

Report and Recommendation, at 10–12 (Mar. 30, 1999).

■ (2) Closely related to the question of the sufficiency of the evidence is the question whether the trial judge responded adequately to the jury's request for the rereading of grand jury testimony of Karen Antonelli. It is the defendant's view that the rereading provided by the trial judge was so limited as to permit the jury to draw the inference that Ms. Antonelli saw Mr. Marra and his co-defendants standing in front of the body of the murder victim right after the shooting. Such an inference would have been highly inculpatory. But such an inference would have been at odds with Ms. Antonelli's trial testimony (on redirect examination that followed the prosecution's confronting Ms. Antonelli with her grand jury testimony) that "I never said I saw a body." Although a strong case can be made for the proposition that it would have been prudent for the trial judge to include in his rereading the pertinent portion of the redirect, I am not persuaded that the trial judge's decision to limit the rereading to the grand jury colloquy was an abuse of discretion of constitutional dimension. (In reaching this conclusion, I am mindful that (1) what the jury requested be reread was grand jury testimony, and (2) the trial judge advised the jury that he would entertain jury requests for the rereading of additional testimony if the jury felt the need for it).

(3) (a) For the reasons addressed by Judge Smith, Mr. Marra's claim that Robert Simone's representation of him at trial was constitutionally deficient is unavailing. Other lawyers might have thought it useful to present character testimony, or might have sought to introduce evidence inculpatory of Phillip Narducci and Jeffrey DiOrio, but Mr. Simone's decisions not to do so were not demonstrably unwarranted.

■ (b) Mr. Marra's claim that Mr. Simone, because of his close association with Phillip Narducci, had an unacceptable conflict of interest, was found by Judge Smith, in his first Report and Recommendation, to be procedurally defaulted. The claim was presented by Mr. Marra on direct appeal in Mr. Marra's petition for allocatur in the Pennsylvania Supreme Court. The claim was again presented in Mr. Marra's application to the trial judge for post-conviction review (P.C.R.A.). But, following the trial judge's denial of post-conviction relief, the claim was not among the issues Mr. Marra presented on appeal to the Superior Court, or, thereafter, by petition for allocatur to the Pennsylvania Supreme Court.[2] Therefore, as Judge Smith determined, the claim cannot be resuscitated in this habeas proceeding.

### Conclusion

For the foregoing reasons, the motion for reconsideration will be denied and the petition for habeas corpus will also be denied. At the same time, given that the issue of the sufficiency of the evidence is certainly a close one, the determination that the evidence was constitutionally sufficient is "debatable among jurists of reason." *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983). I therefore conclude that it is appropriate to accompany denial of the petition with the issuance of a certificate of probable cause for appeal.[3]

### REPORT AND RECOMMENDATION

SMITH, United States Magistrate Judge.

### PROCEDURAL HISTORY

Presently before me is a Motion for Reconsideration from a denial of a Petition

---

**2.** The record in this habeas proceeding sheds no light on why this claim—a claim which, given Mr. Simone's checkered history, may just possibly have had some merit—was not pursued.

**3.** A "certificate of probable cause" for appeal, rather than a "certificate of appealability," is the touchstone for appealability in this case, given that this habeas proceeding was com-

menced in March of 1996. Appeals from petitions for writ of habeas corpus filed prior to the effective date of the Anti–Terrorism and Effective Death Penalty Act—April 24, 1996— are not subject to the requirements for issuance of a certificate of appealability contemplated in that act; they are subject to the standards for issuance of certificates of probable cause articulated in *Barefoot*.

for Writ of Habeas Corpus filed, pursuant to 28 U.S.C. § 2254. For the reasons which follow, it is recommended that the motion be denied [1].

Petitioner was charged with murder and related offenses, including conspiracy, in the shooting death of Michael Ragno at Flanigan's Bar in Philadelphia in the early morning hours of January 13, 1986. On September 29, 1987, after a trial presided over by the Honorable Albert F. Sabo of the Philadelphia County Court of Common Pleas, a jury convicted petitioner of first degree murder and possession of an instrument of crime. The jury acquitted petitioner's co-defendants, Louis DeAngelo and Jeffrey DiOrio, of all charges. On December 22, 1987, Judge Sabo denied petitioner's post-verdict motions and sentenced him to life imprisonment for murder, and a consecutive term of two and a half years for the weapon's offense.

In the habeas petition, at issue, filed on March 22, 1996,[2] petitioner raised the following claims:

1. the evidence was insufficient to support the verdict of first degree murder;

2. the trial court erred in rereading only a portion of Commonwealth witness, Karen Antonelli's grand jury testimony in response to a jury request; and

3. trial counsel, Robert Simone, Esquire, rendered ineffective assistance of counsel in that he:

   a. failed to call character witnesses on behalf of petitioner;

   b. engaged in a conflict of interest that compromised his representation of the petitioner;

   c. because of such conflict, Simone failed to introduce incriminating

statements of Phillip Narducci and co-defendant, Jeffrey DiOrio, and

   d. failed to play an entire videotape made on the night of the murder of the entrance to Flanigan's nightclub.

On January 16, 1997, I filed a Report and Recommendation recommending that the petition be denied and dismissed without an evidentiary hearing. Specifically, I found that plaintiff's claim of trial counsel's alleged conflict of interest had been procedurally defaulted and determined the other claims to be without merit. On August 18, 1997, the Honorable Louis H. Pollak approved and adopted the Report and Recommendation subject to a qualification noted in a Memorandum that he filed on this same date and the case was marked "closed."

Thereafter, on September 2, 1997, petitioner filed a Motion for Reconsideration. Current counsel, Peter Goldberger, Esquire, entered his appearance on October 10, 1997. On October 14, Judge Pollak denied the Motion for Reconsideration. Petitioner filed a Motion to Vacate this order and on October 23, it was granted allowing petitioner time to file a brief. Such was filed and the Philadelphia District Attorney's Office filed a response. On July 27, 1998, Judge Pollak issued a Memorandum and Order remanding this case to me for further consideration and preparation of a new Report and Recommendation. In this Memorandum, he notes that the Motion for Reconsideration again raises the issue of sufficiency of the evidence and specifically the testimony of Karen Antonelli, the issue of trial court error in permitting the jury to rehear a portion of Antonelli's testimony without the inclusion of relevant cross-examination, and ineffective trial counsel [3].

---

**1.** As will be explained, *infra,* I filed a previous Report and Recommendation in this case. The procedural history from petitioner's sentencing to the filing of his habeas petition is detailed in that Report.

**2.** Petitioner, at this time, was being represented by Timothy P. Keating, Esquire.

**3.** In the Motion for Reconsideration, petitioner concedes that the claim of Simone's alleged conflict of interest has been procedurally defaulted and makes no argument to the contrary.

## DISCUSSION

■ A Motion for Reconsideration is the equivalent of a motion to alter or amend the judgment pursuant to Fed.R.Civ.P. 59(e). The purpose of such is to "correct manifest errors of law or fact or to present newly discovered evidence." *Harsco v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir.1985), *cert. denied* 476 U.S. 1171, 106 S.Ct. 2895, 90 L.Ed.2d 982 (1986).[4]

### 1. *Sufficiency of the Evidence*

■ Plaintiff first claims that the evidence was insufficient to support the verdict of first degree murder. The sufficiency question for habeas courts is not whether there was any evidence to support a conviction, but "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt." *Sullivan v. Cuyler*, 723 F.2d 1077 (1983), *quoting Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original); *Paullet v. Howard*, 634 F.2d 117 (3d Cir.1980).

With the benefit of the complete transcript of the trial, I will first outline the testimony of the key witnesses[5], and then consider such under the legal standard set forth above.

Michael Ragno was shot to death in Flanigan's nightclub in the early morning hours of January 13, 1986. There is not much dispute that the victim and the petitioner, earlier in the evening, had engaged in an argument as a result of Ragno talking to the petitioner's girlfriend.

William Rodgers, the victim's friend, testified at trial that he, Michael Ragno, and a Gregory Adair went to Flanigan's after earlier being at another nightclub. He stated that he was in the process of paying a cover charge for all three to enter the club when a male and two females also entered. He knew one female and said "hi" to her. She said "hi" and the petitioner, whom he identified, stated, "that's my girlfriend." The girl said to him that she knew these individuals. Rodgers testified further that Ragno stepped up and the petitioner said, "What's the problem?". Ragno said in response, "Why don't you just relax?". Petitioner stated, "You don't know who I am." Ragno responded, "What's that supposed to mean?". Petitioner said, "You'll see who I am." Petitioner then ran out of the club. Rodgers did not see the shooting since he had gotten separated from Ragno, but did say that it occurred about an hour after this confrontation (R.R. 9/21/87 at 110–123).[6]

There is also not much dispute as to what Commonwealth witness, Susan Murray, testified to at trial. She had been at another nightclub earlier in the night and had met the victim there. She went to Flanigan's about midnight and was at a second floor smaller bar area with friends when she saw Ragno. He said to her that he was going to the restroom and to "stay there and I'll be back." She then observed that he was approached by three men who backed him against a wall standing about a foot away. She turned for an

---

4. While I was preparing my first Report and Recommendation in this case, the Philadelphia Prothonotary's Office was unable to produce the state records including any trial testimony indicating that they were misplaced or lost. Thus, in that Report, I had to rely on the trial testimony as related by the state court decisions. As Judge Pollak points out in his Memorandum, some of the cited testimony in my Report was not reflected in the actual record. This will be discussed, *infra*. However, since that time, petitioner's attorney, Peter Goldberger, was able to reproduce the entire record and had forwarded such to Judge Pollak. Upon no objection from the Philadelphia District Attorney, my office obtained this reproduced record and will use it to revisit the trial testimony and address the merits of the claims. Testimony cited from such will be referred to as "R.R.".

5. Some of which may be repeated or reiterated from my first Report and Recommendation.

6. This testimony concerning the confrontation and the words spoken was corroborated by Bernard Mulholland, the doorman at the club that night and will be discussed, *infra*.

instant to express concern to a friend because Ragno's expression had changed to one of fear. When she turned back around, she was certain that she saw the person in the middle of the three raise his hand with a gun. She then saw a flash and heard a loud noise. She went over to the victim and saw that he had been shot in the face. A girlfriend grabbed her and they fled the club. She could not identify any of the three men and stated on cross-examination that she didn't initially tell the police this story because she was frightened due to her perceptions of the reputations of the people involved (R.R. 9/22/87 at pp. 147–209).

The reproduced record reflects that Karen Antonelli testified that she knew the defendants socially. She stated that she was in the upstairs area of the club when she heard a loud noise which sounded like a firecracker, but in her mind she believed it to be a gunshot. She turned toward the area where the noise came from and saw all three of the defendants standing in a semicircle with Richard Marra being in the middle. She testified that she couldn't recall if co-defendants De Angelo and DiOrio were on his left or right; but had no doubt that the petitioner was in the middle. Like other patrons of the club, she exited quickly. She stated that she never saw the person who got shot or a weapon in the hand of anyone. She reiterated on direct and cross-examination that she did not see a body in front of these men. She also acknowledged that there were other groups of men in this upstairs area (R.R. 9/22/87 at 253–282).

On redirect examination, the Commonwealth in response to Ms. Antonelli's testimony that she never saw a body near the defendants, asked if she remembered a question and answer from her from her grand jury testimony:

"Question: When you turned you saw the three individuals standing in front of the person that was shot before the shot was fired?

"Answer: No, after.

"Question: After?

"Answer: Yes

So you even corrected Mr. Gottlieb [the Assistant District Attorney at this hearing] when he asked the question saying did you see the three males with the body before the shot? Isn't that right?

Mr. Tinari [defense counsel representing co-defendant, DiOrio]: Objection

The Witness: Yes

The Court: Overruled."

She responded that she never saw a body (R.R. 9/22/87 at 279–280). However, as will be discussed, *infra*, the jury apparently believed that this testimony was very important in assessing her credibility as to whether she did see the body since they asked to have this testimony reread to them during deliberations.

Another patron of Flanigan's on this night, Tina Marie Bianchi, also testified at trial. She stated that she was in Flanigan's getting ready to go home and was standing directly across from the landing of the bottom of the steps which led up to the second floor bar area where the shooting occurred. While there, she heard a loud bang from upstairs, looked up, and saw two men running down the stairs, one in front of the other. As the first man reached the bottom of the steps, he lost his footing and began to slide. When he reached the landing, he never stopped, although he was sliding, but bent over to pick something up. It appeared to her that he was placing this object in his waistband. She was certain that this person was the first man down the steps with the other behind him. She described the object as dark and slightly bigger than his hand, but couldn't discern a shape. She couldn't identify him, but said that he was very well dressed, wearing a dark suit with a red tie and that he had a mustache. The two men then ran out of her view and toward the exit (R.R. 9/22/87 at 324–340).

Bernard Mulholland, a doorman at Flanigan's on the night in question, corroborated William Rodgers' testimony that he observed the initial confrontation between petitioner and Michael Ragno. He testified that he heard statements from the petitioner which were very similar as to what Rodgers heard during this incident that, "you don't know who I am" and "you don't know who you are f——king with." Petitioner then ran out of the club (R.R. 9/23 at 376–381).

Mulholland's testimony also corroborated Tina Marie Bianchi's testimony concerning petitioner possibly concealing an object, but unlike Bianchi, he positively identified the petitioner. He testified that about an hour or an hour and a half after the argument between the victim and the petitioner, he heard a loud noise. He remained at the door of the club and no one had exited when he saw petitioner come running down the stairs with a co-defendant behind. He identified petitioner as the individual who had earlier that night been involved in the argument. He testified further that petitioner had his hand thrust into his pocket. Mulholland believed petitioner was concealing a gun and shouted, "look out, he's got a gun, he's got a gun." Mulholland also witnessed the two men run out of the club, cross the street, and get into a parked black Cadillac and flee [7] (R.R. 9/23/87 at 382–400).

In addition, this car, which was registered to the petitioner's family, was deliberately set on fire and destroyed just hours later according to an investigation by the Philadelphia Police Department.

In the court's request for Reconsideration, it was observed that Karen Antonelli's testimony was less inculpatory than I earlier found because the record "does not support a finding that Ms. Antonelli saw the petitioner standing by the body of the victim. In fact, she explicitly stated at trial that she did not see the body at all." [8] He added that "taken alone, Ms. Antonelli's testimony is of limited value in supporting the inference that petitioner was one of the three men seen by Ms. Murray." Memorandum at 2.

Upon review of Ms. Antonelli's testimony, I agree that, taken alone, her testimony does not establish plaintiff as the shooter and is not itself inculpatory. The same can be said for the testimony of Williams Rodgers, Susan Murray, Tina Marie Bianchi, and Bernard Mulholland. Taken individually, none of this testimony would be sufficient to convict petitioner since Murray, Bianchi, and Mulholland could not identify petitioner as the murderer and Antonelli testified that she did not see the body near the defendants. However, each of these witnesses' testimony is probative and their cumulative effect "based on an interpretation of the facts and *inferences* (emphasis added) made most favorably to the prosecution," could rationally lead a jury to conclude that the petitioner was guilty of first degree murder.[9] *Jackson v. Virginia, supra.*

In assessing the totality of the testimony before them, the jury heard: 1) Rodgers testify about the confrontation between the victim and the petitioner and his threat to Ragno that "You'll see who I

---

7. Although there is no question that other patrons of Flanigan's on this night were wearing jackets and ties, and Bianchi couldn't positively identify petitioner, Mulholland did corroborate her testimony that the person she saw coming first down the steps, which he did identified as the petitioner, was wearing a dark jacket with a tie and also had a mustache (R.R. 9/23/87 at 391,395).

8. Relying on the trial testimony as related in the state court decisions, I erroneously wrote in my prior Report that Susan Murray saw

the three men in a "semi-circle" and that Karen Antonelli observed the men standing over the body. Report and Recommendation at 10.

9. Under 18 Pa.C.S.A. § 2502, first degree murder is defined as follows:

A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing.

am"; 2) Susan Murray testify that she saw a man in the middle of three fire a gun and shoot the victim; 3) Karen Antonelli testify that she turned and looked at the area where the loud noise came from and identified petitioner as the one in the middle, and her possibly conflicting grand jury testimony, that they wanted reread to them during deliberations, which put into question whether she saw the defendants near the body; 4) Tina Marie Bianchi testify that she saw someone run down the steps immediately after the "loud noise" and apparently conceal a dark object in his pants; and 5) Bernard Mulholland corroborate Rodgers' and Bianchi' testimony concerning the threats made to Ragno at the earlier confrontation and petitioner actions after the shot being the first to run out of the club with his hand in his pocket apparently concealing something and flee in a car later found burned and registered to the petitioner's family.

From this testimony and the inferences permitted to be drawn from such under *Jackson*, I find that a rational trier of fact could have found the essential elements of the crime of first degree murder beyond a reasonable doubt. *Sullivan v. Cuyler, supra; Jackson v. Virginia, supra.*

### 2. *Trial Court Error*

Petitioner next argues that the trial court abused its discretion when it allowed only a portion of Karen Antonelli's testimony to be read to the jury without the accompanying cross-examination, thereby placing "undue influence" upon a particularly prejudicial portion of testimony, namely grand jury testimony.

■ I begin with outlining the relevant case law, as in my previous Report and Recommendation. Review of this claim is restricted to whether the alleged error deprived the petitioner of a fundamentally fair trial. *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).

■ When a jury requests that recorded testimony be read to it to refresh its memory, it rests within the trial court's discretion to grant or deny such a request. The parameters concerning the extent that testimony should be read to the jury are to be set by the jury's request. "Hence the court, if it deems it appropriate, may permit the jury to hear only a portion of a witness' testimony." *Commonwealth v. Bell*, 328 Pa.Super. 35, 54, 476 A.2d 439 (1984) (allocatur denied); *see also, Commonwealth v. Peterman*, 430 Pa. 627, 244 A.2d 723 (1968); *Commonwealth v. Coley*, 297 Pa.Super. 435, 444 A.2d 110 (1982).[10]

The record here indicates that the court received a question from the jury during deliberations asking, "could we please see the grand jury testimony of Karen Antonelli concerning the three people she saw before the shoot[ing] and after the shoot[ing]." In support of this claim, petitioner's counsel cites a case, *United States v. Rabb*, 453 F.2d 1012 (3d Cir.1971), which used a test to determine whether there has been an abuse of discretion in denying a jury request for clarification.

However, this case has no relevance here because the trial judge never denied the jury's request, but rather, as the record reflects, was very concerned about answering the question. In fact, there was a long heated discussion between counsel and the trial judge, outside the presence of the jury, in an attempt to determine specifically what the jury wanted read to them. Judge Sabo repeated several times that he intended to give the jury what it requested, but was attempting to determine exactly what that was. As is within his discretion to do, he determined what he would read to the jury to satisfy their inquiry. He went on to specifically read the grand jury question posed to Karen Antonelli and her answer. He further said to the jury that, "if there's anything else that you need for your deliberation, let me

---

**10.** There is no inflexible rule that exists which mandates that in reading back testimony to the jury, cross-examination always must be

read. *United States v. Bennett*, 75 F.3d 40 (1st Cir.1996); *United States v. Wright–Barker*, 784 F.2d 161 (3d Cir.1986).

know but try to be more specific in your questions." Thus, this claim is meritless since Judge Sabo, after much debate and consideration, answered the jury's specific question and invited them to ask more questions if they so desired [11] (R.R. 9/28/87 at 819–849).

### 3. *Ineffective Assistance of Counsel*

*Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), created a two-prong test that a petitioner must satisfy before his conviction will be overturned on ineffective grounds. First, he must show that counsel's performance was deficient, and secondly, he must show that the deficiency prejudiced his defense to such an extent that the result is unreliable. *Id.* at 687, 104 S.Ct. 2052.

The standard against which the attorney's performance is measured is reasonableness; counsel's performance must comply with prevailing professional norms. *Id.* at 688, 104 S.Ct. 2052. The Court instructed:

> "... (the reviewing court) must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct ... "

*Id.* at 690, 104 S.Ct. 2052.

Above all, the reviewing court must make certain that the petitioner received a fair trial with a just result. *Id.* at 686, 104 S.Ct. 2052.

### a. *Failure to Call Character Witnesses*

■ Trial counsel's performance cannot be deemed "deficient" under *Strickland's* first prong. Simone's decision not to call character witnesses was a reasonable strategic decision. He testified at a PCRA hearing that he was aware that plaintiff was a "candidate for the offering of character witnesses" since he was not aware of a prior criminal record [12] (R.R. 3/17/92 at 937). He concluded, however, as did the attorneys of the two co-defendants, that the Commonwealth had not met its burden of proof and decided because of the Commonwealth's weak case that he intended not to offer any defense evidence.

■ Simone recalled his reasoning for not presenting such in his PCRA testimony. He stated that there was no identification of the shooter and that there were so many people in the club besides the petitioner that there was at least a reasonable doubt as to his guilt in the shooting (R.R. 3/17/92 at 954). Apparently this was sound trial strategy since both of Simone's co-counsel employed the same reasoning and the co-defendants were both acquitted of all charges. Thus, petitioner's claim fails under *Strickland's* first prong [13].

■ This claim also fails under *Strickland's* second part—that counsel's deficiency prejudiced petitioner's defense. Petitioner's counsel argues in his brief that

**11.** Although the issue is not raised in counsel's Memorandum for Reconsideration, petitioner, in his own authored Petition for Reconsideration, contends that this court should focus on the jury's first question, asking to having all of the testimony of Karen Antonelli read to them. However, using his discretion, Judge Sabo declined to read the entire testimony and was concerned with addressing any specific questions the jury had about Antonelli's testimony. He told the jury to "trust their own memories", and try and resolve among themselves what part of her testimony they were interested in (R.R. 9/28/87 at 824). As is discussed above, this is what occurred. The jury came back and requested that a particular portion of her grand jury testimony be read to them. Judge Sabo did so and offered to read more if requested (R.R. 9/28/87 at 829, 849).

**12.** As was noted in my first Report and Recommendation, petitioner had been arrested for assault two years prior to the murder.

**13.** The defense has no obligation to call or even to interview a witness whose testimony would not have exculpated the petitioner or would have been inconsistent with the theory of defense. *United States v. Porter,* 924 F.2d 395, 397 (1st Cir.1991).

my rejection of "the ineffective assistance claims is factually dependent on the erroneous recitation of the evidence of guilt (having relied on same mistaken description of Antonelli testimony)." Brief at 12. This argument fails because, as discussed in detail above, I have corrected any Antonelli testimony that may have been misstated in my prior Report and Recommendation and concluded that the totality of her testimony with that of the other key witnesses presented at trial was sufficient under the *Jackson v. Virginia, supra,* standard for a "rational trier of fact" to conclude that the petitioner was the shooter of the victim [14]. Thus, the petitioner has failed to establish that trial counsel's decision not to call character witnesses prejudiced his defense [15].

In conclusion, the standard in reviewing a Motion for Reconsideration is "to correct manifest errors of law or fact or present newly discovered evidence." *Harsco v. Zlotnicki, supra.* Petitioner has failed to establish such and the motion should be denied.

Therefore, I make the following:

## RECOMMENDATION

AND NOW, this 26th day of March, 1999, IT IS RESPECTFULLY RECOMMENDED that the Motion for Reconsideration of the dismissal of the Petition for Writ of Habeas Corpus, pursuant to 28 U.S.C. § 2254, be DENIED and DISMISSED WITHOUT AN EVIDENTIARY HEARING.

There is no probable cause to issue a certificate of appealability.

March 26, 1999.

---

**14.** Moreover, complaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what a witness would have testified to are largely speculative. *Lockhart v. McCotter,* 782 F.2d 1275 (5th Cir.1986); *see also Murray v. Maggio,* 736 F.2d 279, 282 (5th Cir.1984); *Boyd v. Estelle,* 661 F.2d 388, 390 (5th Cir.1981).

**15.** Petitioner's second ineffective claim that Simone failed to introduce into evidence incriminating statements made by Philip Narducci and co-defendant Jeffrey DiOrio that were exculpatory to the petitioner was discussed, in detail, in my previous Report. It is noted that Simone testified at a PCRA hearing that it was a strategic decision not to attempt to use these statements because he considered them harmful to the defense and helpful to the prosecution. He "thought if it would hurt Jeffery DiOrio, there would be a spillover effect [to petitioner]" (R.R. 3/17/92 at 945–6).

Likewise, petitioner's last ineffective claim that counsel failed to play the entire videotape of patrons entering and leaving Flanigan's on the night in question was also thoroughly considered in the prior Report. Thus, these issues will not be revisited.