

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-21-2002

# Marra v. Larkins

Precedential or Non-Precedential: Non-Precedential

Docket No. 00-2737

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Marra v. Larkins" (2002). *2002 Decisions.* Paper 289.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/289

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 00-2737
_____

RICHARD J. MARRA,
                    Appellant

v.

DAVID LARKINS, Superintendent, Dallas SCI;
DISTRICT ATTORNEY FOR THE PHILADELPHIA COUNTY;
THE ATTORNEY GENERAL OF THE STATE OF PENNSYLVANIA
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
D.C. Civil No. 96-cv-02375
District Judge:  The Honorable Louis H. Pollak
_____

Argued February 11, 2002
_____

Before: MANSMANN, McKEE, and BARRY, Circuit Judges

(Opinion Filed: May 21,  2002)
_____

Peter Goldberger, Esq. (Argued)
Law Office of Peter Goldberger
50 Rittenhouse Place
Admore, PA 19003-2276

Attorney for Appellant


David C. Glebe, Esq. (Argued)
Thomas W. Dolgenos, Esq.
Office of the District Attorney
1421 Arch Street
Philadelphia, PA 19102

Attorneys for Appellees

_____

OPINION
_____


BARRY, Circuit Judge

This case involves a 28 U.S.C. 2254 habeas corpus petition filed by Richard Marra, who was convicted of first-degree murder on September 28, 1987 and sentenced to life imprisonment. The District Court denied Marra's petition on August 15, 2000. Marra v. Larkins, 111 F. Supp. 2d 575 (E.D. Pa. 2000). We have jurisdiction pursuant to 28 U.S.C. 1291 & 2253, and will affirm.

I.

The factual background of this case is fairly straightforward. In the early hours of January 13, 1986, 24-year old Michael Ragno was fatally shot in the head at point blank range on the second floor of Flanigan's, a Philadelphia night club. It is undisputed that Marra argued with and threatened Ragno at the club entrance because Ragno came to the aid of a friend who said "hi" to Marra's girlfriend.

Approximately an hour after the confrontation, Ragno was murdered. While the precise circumstances of the murder are hotly contested, an eye witness testified that three men backed Ragno up against a wall on the second floor of Flanigan's, and that the man in the middle of these three antagonists shot and killed Ragno. Another eye witness identified Marra as the man in the middle of a group of three at that location immediately after the gun shot sounded. Following the shooting, Marra was seen fleeing the club while concealing a dark object in or about his waistband. He was then seen getting into his car and leaving the scene. Just hours later, the police found Marra's car deliberately destroyed by fire.

Marra was tried along with two co-defendants, Jeffrey M. DiOrio and Louis A. Deangelo, Jr., before a Philadelphia County Court of Common Pleas jury. On September 29, 1987, the jury convicted Marra of first-degree murder and a related weapons charge, but acquitted his co-defendants. Marra was sentenced to life imprisonment.

On March 22, 1996, after pursuing his state court appeals, Marra filed this habeas petition. The Magistrate Judge recommended denial of the petition, apparently without having had access to the trial record because it had been mislaid. The District Court denied the petition, but subsequently vacated its denial of Marra's motion for reconsideration when the trial record was produced. The Magistrate Judge recommended denial of the renewed motion for reconsideration, and the District Court adopted that recommendation in an Opinion and Order filed August 6, 2000.

On appeal, Marra contends that (a) the evidence presented was insufficient to prove guilt beyond a reasonable doubt, (b) the trial court denied him due process by reading back only a portion of testimony in response to a note submitted by the jury during deliberations, and (c) the District Court erred in finding his ineffective assistance of counsel claim because of a conflict of interest to be procedurally barred.

II.

Before turning to the merits, we note that this habeas petition was filed before the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Accordingly, the AEDPA is inapplicable. Where, as here, the District Court based its decision on the record of the state court proceedings, our review of that decision is plenary. Bey v. Morton, 124 F.3d 524, 528 (3d Cir. 1997); Johnson v. Rosemeyer, 117 F.3d 104, 109 (3d Cir. 1997); Jackson v. Byrd, 105 F.3d 145, 147 (3d Cir. 1997).

A. Sufficiency of the Evidence

It is well-settled that a sufficiency of the evidence challenge requires us to view the evidence and all reasonable inferences therefrom in the light most favorable to the prosecution and determine whether any rational jury could have found guilt beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); Jackson, 105 F.3d at 148. Applying this standard, the District Court concluded that the "evidence was sufficient even if only by a narrow margin." Marra, 111 F. Supp. 2d at 578.

Viewing the evidence in the light most favorable to the prosecution, a reasonable jury could have found the following:

Marra and Ragno had a brief altercation at the club entrance when Marra accosted Ragno's friend for saying "hi" to Marra's girlfriend. During this exchange, Marra implicitly if not explicitly threatened Ragno with physical harm when he said "you don't know who I am," "you don't know who you are f[ ]king with," and "you'll see who I am." Marra then ran from the club, but later returned.

Approximately an hour later, Ragno and Susan Murray were conversing on the second floor of the club. Marra was also on the second floor at this point. Ragno excused himself to go to the men's room when he was confronted by three men who

proceeded to back him towards a wall.  Murray witnessed the man in the middle of this group shoot and kill Ragno at point blank range, but she could not see the faces of the three men as their backs were to her.  There were no other threesomes near Ragno at this time.  Murray turned to alert the bartender, and consequently did not see what the killer did immediately thereafter.  Seconds later, however, Karen Antonelli turned in the direction of the gun shot and saw Marra standing between his two co-defendants.  Murray's and Antonelli's testimony, coupled with the evidence of the prior confrontation and threats and the testimony of doorman Bernard Mulholland and patron Tina Marie Bianchi that Marra fled the scene, dropped a black object during his flight, and then attempted to conceal that object in his waistband, permitted the jury to find that Marra shot Ragno.

Marra attempts to debunk this evidence by pointing to purported inconsistencies in the witnesses's testimony.  Before turning to Marra's specific contentions, we note that his argument generally suffers from a failure to construe the evidence in the light most favorable to the prosecution.  Instead, Marra couches the evidence in the light most favorable to him, again and again suggesting what inferences the jury should have drawn.

Marra's principal contention is that Murray's and Antonelli's versions of the facts are inconsistent because Murray said the killers had their backs to her, while Antonelli, sitting approximately in the same area as Murray, turned and saw Marra and his co-defendants facing her.  This contention is unpersuasive.  Simply put, in the time it took Antonelli to turn in the direction of the gun shot, Marra could well have turned around preparatory to exiting the club.  The jury could, and presumably did, draw that inference.

Next, Marra places great weight on Antonelli's failure to see a body near him or to see a gun.  As the government suggests, however, the jury could reasonably have inferred that Ragno's felled body was behind the three defendants.  As for the gun, the jury could reasonably have inferred that it was at Marra's side and overlooked while Antonelli focused on his face, or was concealed in or obscured by Marra's clothing.

Marra also contends that Mulholland's and Bianchi's testimony is fatally inconsistent because Bianchi saw a man running down the stairs from the second floor, saw him drop a black object, pick it up, and place it in his waistband, while Mulholland did not observe this fumbling when he saw Marra running down the stairs.  Again, this contention is unavailing because it views the evidence in the light most favorable to Marra.  The jury could well have inferred that Mulholland and Bianchi observed Marra at different points as he descended the stairs, or could simply have given greater weight to Mulholland's testimony because he was able to positively identify Marra.  It is undisputed, we note, that both witnesses thought Marra was concealing some object on his person.

At the end of the day, Marra simply alleges certain inconsistencies which the jury resolved in the prosecution's favor.  The weakness in the prosecution's case was that no single witness could identify Marra as the shooter.  Given the sequence of events, however, the jury could readily have found that Murray's and Antonelli's testimony provided such an identification.  Accordingly, the evidence was sufficient to support the jury's verdict.

B.  Grand Jury Transcript

Marra next contends that his due process rights to a fair trial were violated because the trial court, in response to a jury note asking for specific grand jury testimony on which Antonelli had been questioned at trial, did not also reread her trial testimony concerning that grand jury testimony.  Marra opines that the fairness of his trial "was destroyed" by the trial judge's response to the jury's note.  Marra is wrong.

A trial court, of course, has discretion in deciding how to respond to a jury note.  To prevail on his due process claim, Marra must show that the court's response violated the "fundamental fairness" essential to justice.  Donnelly v. DeChristoforo, 416 U.S. 637, 642 (1974).

The disputed testimony centered on whether or not Antonelli had testified before the grand jury that she had seen a body behind Marra at the time of the shooting.  On cross-examination during trial, Antonelli testified that she had not seen a body behind the three defendants.  The prosecution then tried to establish that Antonelli had, in fact, seen a body by reading her the following questions and answers from her grand jury

testimony:

Q: When you turned you saw the three individuals standing
in front of the person that was shot before the shot was fired?

A: No, after.

Q: After?

A: Yes.

Joint App. 386:14-19 (emphasis added). The prosecution then asked Antonelli if she had testified before the grand jury that she "saw the three individuals standing in front of the person who was shot after the shot was fired?" Joint App. 387:3-5. Antonelli responded: "I never said I saw the body." Joint App. 387:6. Both sides then questioned Antonelli at some length about the meaning of her grand jury testimony.

Shortly after commencing deliberations, the jury submitted a note requesting, among other things, "the testimony of Karen Antonelli." The trial judge explained that he would not give them anything in writing and that Antonelli's testimony had not yet been transcribed. He offered, at the behest of Marra's counsel, to read any specific portion of Antonelli's testimony the jury desired. The jury promptly returned with a note stating: "Could we please see the grand jury testimony of Karen Antonelli concerning the three people she saw before the shoot after the shoot?" A great debate as to the meaning of this note and how the court should respond followed, a debate which covered twenty-four pages of transcript.

The trial judge concluded apparently because of the jury's use of the words "before" and "after" the "shoot" that the jury wanted to hear the Q&A quoted above and read only those lines to the jury. He also offered to read additional testimony if the jury so desired which, as it turned out, it did not.

Marra contends that the trial court's "overly literal response to the jury's question" denied the jury needed information. He opines that if "the jury understood the limited significance of Ms. Antonelli's response to the prosecutor's leading and compound question before the grand jury, and recalled her firm adherence to her direct testimony under cross-examination at trial, then a different outcome was highly likely." Appellant's Br. at 28.

Notwithstanding Marra's prognostication of a different outcome, he has unearthed no fundamental unfairness in the trial court's response to the jury's request. What was read to the jury was precisely what it had requested. In addition, what was read had the benefit of omitting both side's interpretation of the meaning of the Q and A elicited during the examination of Antonelli at trial which presumably the jury recalled because it did not request a reread of that testimony. We simply do not detect any fundamental unfairness here.

C. Conflict of Interest

Marra's final contention, i.e. that his trial counsel, Robert Simone, was ineffective because he operated under a conflict of interest, is the most intriguing. Unfortunately for Marra, however, it is also procedurally defaulted.

At the time of trial, Simone was also representing, and allegedly engaged in a criminal RICO conspiracy with, mob boss Nicodemo Scarfo. Simone was subsequently convicted and disbarred on consent for, as the District Court termed it, this "checkered history." Phillip Narducci the Flanigan's patron sitting next to Antonelli at the time of Ragno's demise allegedly worked for Scarfo in less than legal endeavors and was Scarfo's co-defendant in the case in which Simone represented Scarfo. Marra suggests that Narducci was the other "prime suspect" in the Ragno murder, and that Simone did not press this angle of the case enough out of deference to Scarfo and Narducci.

After Simone handled Marra's direct appeal to the Superior Court, Marra, represented by new counsel, raised his conflict of interest claim for the first time before the Pennsylvania Supreme Court in his petition for allocatur. The petition was denied without opinion in December 1989. Marra then re-raised the issue before the trial court in his March 1991 Post Conviction Relief Act ("PCRA") petition, but did not present the issue in his subsequent appeal from the denial of his petition in June 1993 to the Superior Court or to the Pennsylvania Supreme Court in his allocatur petition.

The District Court adopted the Magistrate Judge's initial Report and Recommendation which, as relevant here, determined that Marra's conflict of interest claim was procedurally barred because he failed to appeal the issue to the Superior Court or to the Pennsylvania Supreme Court and thereby denied the state courts a fair opportunity to address the issue. It subsequently adopted the second Report and Recommendation as well, finding that, as the Magistrate Judge determined, the claim was defaulted and could not be resuscitated in the habeas proceeding.

It is well-settled, of course, that a prisoner must first present all federal claims state court before a district court may reach those claims on federal habeas corpus review. 28 U.S.C. 2254(b) & (c); O'Sullivan v. Boerckel, 526 U.S. 838, 843 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."); Caswell v. Ryan, 953 F.2d 853, 857 (3d Cir. 1992). To comply with this requirement, a petitioner is generally required to give the state courts a "full and fair opportunity" to address the merits. O'Sullivan, 526 U.S. at 844; Keeney v. Tamayo-Reyes, 504 U.S. 1, 10 (1992). "Full and fair opportunity" means presenting the issue in a manner that puts the state court on notice that the claim is being pursued so that the state court has a chance to resolve that claim, i.e., some articulation of the sum and substance of the claim is required, not merely a whisper of constitutional impropriety. As the Supreme Court stated in Keeney:

> Exhaustion means more than notice. In requiring exhaustion of a federal claim in state court, Congress surely meant that exhaustion be serious and meaningful. . . . Comity concerns dictate that the requirement of exhaustion is not satisfied by the mere statement of a federal claim in state court. Just as the State must afford the petitioner a full and fair hearing on his federal claim, so must petitioner afford the State a full and fair opportunity to address and resolve the claim on the merits.

Id.; see also Anderson v. Harless, 459 U.S. 4, 6 (1982) ("It is not enough that all the f necessary to support the federal claim were before the state courts. . . . In addition, the habeas petitioner must have 'fairly presented' to the state courts the 'substance' of his federal habeas corpus claim.") (citations omitted).

Procedural default also occurs where a petitioner failed to exhaust state remedies and the court to which he would have been permitted to present his claims would now find such claims procedurally barred. Coleman v. Thompson, 501 U.S. 722, 735 n.* (1990); Whitney v. Horn, 280 F.3d 240, 252 (3d Cir. 2002); Wenger v. Frank, 266 F.3d 218, 223-24 (3d Cir. 2001), cert. denied, 122 S. Ct. 1364 (2002); McCandless, 172 F.3d at 261; Caswell, 953 F.2d at 857. To overcome procedural default in these circumstances, a petitioner must show either cause for the default and actual prejudice as a result of the alleged error or a fundamental miscarriage of justice if the claim is not considered. Edwards v. Carpenter, 529 U.S. 446, 451 (2000); Coleman, 501 U.S. at 750; McCandless, 172 F.3d at 261; Caswell, 953 F.2d at 861. The District Court held that Marra's conflict of interest claim was procedurally defaulted because he failed to pursue that claim before the Superior Court in appealing his PCRA petition, and he otherwise failed to carry his burden of showing "cause" and "prejudice" or a "fundamental miscarriage of justice."

On appeal, Marra does not dispute that he cannot show cause and prejudice or a fundamental miscarriage of justice or that his claim, if not fairly presented to the Pennsylvania courts, would now be procedurally barred. He argues, however, that there is no bar to federal habeas review for two reasons. First, he asserts that his conflict of interest claim was preserved because it was actually presented, albeit obscurely, in his appeal to the Superior Court from the trial court's denial of PCRA relief, although he concedes that it was not "mentioned in words or substance" in his subsequent petition for allocatur to the Supreme Court. Appellant's Br. at 32 n.19. Second, he claims that, in any event, he did not need to pursue his conflict of interest claim in the appeals from the PCRA proceeding because the claim was raised in his petition for allocatur to the Supreme Court on direct appeal, which thereby gave the highest court in the state a chance to address the claim. We will address these arguments in turn.

Marra's contention that he actually presented his conflict of interest claim to the Superior Court is belied by the record. The crux of Marra's argument is that in the course of arguing to the Superior Court that counsel was ineffective for other reasons, he mentioned, albeit in one paragraph near the end of his fifty page brief, Simone's relationship to and legal representation of Narducci and cited two lines from Simone's testimony at the PCRA hearing as to whether he was wearing "two hats" during the trial. Appellant's Br. at 32. In other words, Marra seems to contend that raising some ineffective assistance of counsel claims is sufficient to preserve all putative ineffective assistance of counsel claims, provided that some factual clues for such potential claims are referenced somewhere in the state court briefs.

The difficulty with Marra's argument is that merely alluding to facts that might constitute a separate ineffective assistance claim on conflict grounds is not enough to fairly present that claim, especially when the conflict claim was expressly presented before the PCRA court and then was not listed on appeal as an issue. In effect, Marra punted on his conflict of interest claim on appeal, leaving the Superior Court with no reason to perceive, much less to pursue, that issue. Indeed, the thrust of Marra's appeal to the Superior Court was a typical ineffective assistance of counsel claim based on alleged missteps at trial, rather than any challenge based on a conflict of interest. Accordingly, Marra failed to fairly present the substance of his conflict of interest claim to the Superior Court or to the State Supreme Court on the subsequent petition for allocatur and that claim is now procedurally barred under Pennsylvania law.

Marra's contention that his petition for allocatur on direct appeal to the Pennsylvania Supreme Court was itself a fair presentation is also unpersuasive. Marra notes that Pennsylvania law required him to raise his ineffective assistance counsel claim at the earliest appropriate opportunity after Simone's representation ended here, on direct appeal to the Pennsylvania Supreme Court to avoid waiver of that claim. Commonwealth v. Green, 709 A.2d 382, 384 (Pa. 1998); Commonwealth v. Hubbard, 372 A.2d 687, 695 (Pa. 1977). Accordingly, the argument goes, because he was required to and did present the issue on direct appeal in his petition for allocatur, he "by definition" fairly presented his conflict of interest issue to the state's highest court, and required to do no more for purposes of 28 U.S.C. 2254.

Marra is mistaken because he misconceives the meaning of "full and fair presentation" and overlooks the role of the PCRA proceeding within Pennsylvania practice. As the United States Supreme Court recently explained, the full and fair presentation doctrine requires petitioners to "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan, 526 U.S. at 845 (emphasis added); Lines v. Larkins, 208 F.3d 153, 159 (3d Cir. 2000) ("All claims that a petitioner in state custody attempts to present to a federal court for habeas corpus review must have been fairly presented to each level of the state courts."), cert. denied, 531 U.S. 1082 (2001); see also Castille v. Peoples, 489 U.S. 346, 349-51 (1989). Under this teaching, the state appellate courts must reach the merits of the federal claim at some point, after which, in Pennsylvania, the state Supreme Court's denial of discretionary review can be sufficient to preserve the federal claim (provided that the claim was presented in the allocatur petition).

Here, the Superior Court on appeal from the denial of the PCRA petition was not given a fair shot at petitioner's conflict of interest claim and the issue was not presented in the subsequent petition to the Supreme Court. Marra's presentation of his conflict of interest claim to the Supreme Court on direct appeal was not itself a "full and fair" presentation because, at that point, Pennsylvania's PCRA procedure remained available to him and, in fact, later developed the record in the form of Simone's testimony upon which his conflict of interest claim now heavily depends. Thus, the claim Marra pursues here on appeal is different (because of Simone's intervening testimony) than the claim briefed to the state Supreme Court on direct appeal. Castille, 489 U.S. at 349-51 (holding that mere presentation of claim to Pennsylvania Supreme Court, without recourse to collateral review, in a petition for allocatur was insufficient to satisfy habeas exhaustion requirements); Evans, 959 F.2d at 1230 ("A claim is not deemed exhausted if it is raised for the first time in the state's highest court on discretionary review."). Indeed, in the typical case in which the Pennsylvania Supreme Court denies a petition for allocatur on direct appeal, a prisoner's recourse is to initiate a

PCRA proceeding because the denial of allocatur is not itself a decision on the merits. Commonwealth v. Davis, 683 A.2d 873 (Pa. 1996).

Parenthetically, Marra's contention that his exhaustion responsibilities were complete upon filing his allocatur petition on direct appeal, taken to its logical extreme, would mean that he was not obligated to initiate a PCRA proceeding prior to filing his habeas corpus petition.  Such a contention is untenable where the evidence underlying the conflict of interest claim had, at that time, never been presented to a state court and no appellate court had reached the merits of his claim, i.e., this is not a case in which it would have been futile or repetitive to insist that Marra pursue collateral relief in the state courts.  Compare Castille, 489 U.S. at 350 (noting "that once the state courts have ruled upon a claim, it is not necessary for a petitioner" to seek collateral relief based on the same evidence and issues already decided on direct appeal) (emphasis added).

At the end of the day, it can hardly be said that the Pennsylvania courts were "fairly presented" with a "full opportunity" to assess Marra's conflict of interest claim where the Superior Court was never explicitly presented with the claim and where the facts upon which the claim primarily relies were developed in a PCRA hearing held more than two years after Marra's direct appeal to the Supreme Court.  Marra has simply not pursued a complete round of appellate review on his conflict claim and, accordingly, that claim is procedurally barred.

### III.

For all the foregoing reasons, we will affirm the order of the District Court denying the petition for habeas corpus.

TO THE CLERK OF THE COURT:

Kindly file the foregoing Opinion.

/s/ Maryanne Trump Barry
Circuit Judge